# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **MARY M. CAMPOS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 02 C 8919** |
| | ) | |
| **JOANNE B. BARNHART, Commissioner** | ) | |
| **of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

NAN R. NOLAN, Magistrate Judge:

Plaintiff Mary Campos seeks judicial review of the final decision of defendant Joanne

Barnhart, Commissioner of the Social Security Administration ("Commissioner"), denying

Campos' claim for disability insurance benefits under Title II of the Social Security Act, 42

U.S.C. § 423. This matter is before the court on the parties' cross-motions for summary

judgment. Campos asks the court to either reverse the Commissioner's decision and grant her

disability insurance benefits, or alternatively, to remand her case to the Commissioner for another

hearing. The Commissioner, on the other hand, seeks an order affirming the decision to deny

Campos' application for benefits. For the reasons set forth below, the court grants the

Commissioner's motion for summary judgment and denies Campos' motion.

## I.   PROCEDURAL HISTORY

On October 24, 2000, Campos submitted an application for disability insurance benefits,

asserting that she had been disabled due to bilateral carpal tunnel syndrome and a torn rotator

cuff since July 2, 1999.[1]  (R. 63, 98.)  The Social Security Administration ("Agency") denied that

application as well as Campos' request for reconsideration.  (R. 69-72, 75-77.)  Campos timely

requested an administrative hearing, which was held on January 17, 2002 by Administrative Law

Judge James A. Horn ("ALJ").  (R. 13, 20.)  Campos argued to the ALJ that she was entitled to

ongoing disability insurance benefits since July 2, 1999, or alternatively, that she was entitled to

disability insurance benefits for a closed period of disability from July 2, 1999 through March 6,

2001.  In an opinion dated June 27, 2002, the ALJ concluded that Campos had the ability to

perform light, unskilled work and thus was not disabled within the meaning of the Social

Security Act.  (R. 17.)  Accordingly, the ALJ denied Campos' application for disability insurance

benefits.  (R. 18.)  Campos then requested review of the ALJ's decision by the Appeals Council,

which was denied in a letter dated October 11, 2002, (R. 5-6), making the ALJ's decision a final

and appealable order.  *See* 20 C.F.R. § 404.981; *Herron v. Shalala,* 19 F. 3d. 329, 332 (7th Cir.

1994).  Campos has appealed the ALJ's order to the federal district court pursuant to 42 U.S.C.

§ 405(g).  The parties have consented to a decision by a Magistrate Judge pursuant to 28 U.S.C §

636(c).

---

[1]Campos previously applied for disability insurance benefits on February 5, 1999, alleging a disability onset date of October 24, 1997.  (R. 92-94.)  That application was denied on May 13, 1999 and not appealed.  (R. 13, 65-68.)

## II.    BACKGROUND

### A.    Medical History Prior to Claimed Disability Onset Date of July 2, 1999.[2]

In her application for disability insurance benefits, Campos claims that she has been disabled since July 2, 1999 due to bilateral carpal tunnel syndrome[3] and a torn rotator cuff.

Campos' medical records reveal that since 1996, she has had seven surgical procedures during five separate operations.[4]  In December of 1995, Campos sought medical treatment for pain, numbness, and tingling she was experiencing in both hands, wrists and elbows.  (R. 233.) Dr. Scott O'Connor diagnosed her with bilateral carpal tunnel syndrome and bilateral cubital tunnel syndrome.[5]  To correct those problems, Dr. O'Connor performed a carpal tunnel release on Campos' left wrist and an ulnar nerve transposition on her left elbow in May 1996, and performed those same procedures on her right wrist and elbow the following month.  (R. 210,

---

[2]In seeking reversal of the ALJ's decision, Campos emphasizes the fact that she underwent seven surgeries since 1996.  Only two of those surgeries occurred after the claimed disability onset date of July 2, 1999.  Nevertheless, the court includes Campos' medical history prior to the onset date of her claimed disability in order to provide thorough background information.

[3]Carpal tunnel syndrome is "a complex of symptoms resulting from compression of the median nerve in the carpal tunnel, with pain and burning or tingling paresthesias in the fingers and hand, sometimes extending to the elbow."  Dorland's Illustrated Medical Dictionary 1751 (29th ed. 2000).

[4]Campos had surgery on her left wrist and elbow in May 1996, on her right wrist and elbow in June 1996, on her right shoulder in January 1998, on her right shoulder again in November 1999, and on her right elbow in August 2000.  (R. 217-218, 225-227, 229-230, 302-303, 305-307.)

[5]Cubital tunnel syndrom is "a complex of symptoms resulting from injury or compression of the ulnar nerve at the elbow, with pain and numbness along the ulnar aspect of the hand and forearm, and weakness of the hand."  Dorland's Illustrated Medical Dictionary 1753 (29th ed. 2000).

3

225-227, 229-233). Dr. O'Connor subsequently authorized Campos to return to work as of August 19, 1996 on light duty (lifting no more than 20 pounds), and as of September 9, 1996 without restriction. (R. 223-224.)

In a visit to Dr. O'Connor in August 1997, Campos reported that she injured her right shoulder in June of 1997 when she was lifting some cardboard. (R. 210, 221.) Dr. O' Connor placed Campos on work restrictions, (R. 220-221), but eventually found it necessary to perform an arthroscopic subacromial decompression (or release) of her right shoulder in January of 1998, (R. 217-218). Dr. O'Connor authorized Campos to return to work with restriction in March of 1998, and at the end of May 1998, he authorized Campos to return to work without restrictions. (R. 216.) On June 8, 1998, however, Dr. O'Connor reduced Campos to light duty again after she complained of pain in her right shoulder and recurrent symptoms of carpal tunnel syndrome. (R. 215.) In September 1998, Dr. O'Connor opined that Campos would probably need a permanent restriction regarding her right arm to avoid any type of repetitive use. (R. 214.) In November 1998, Campos received a cortisone injection to alleviate the pain in her right shoulder. (R. 210.) Also in November of 1998, Dr. O'Connor stated his opinion that Mrs. Campos was "partially disabled and is unable to use her right upper extremity for any type of work" and that he had "no estimate as to when this restriction will be lifted." (R. 210.)

Between August 1998 and January 1999, Campos also saw Dr. Charles Carroll, an orthopedic specialist, who was engaged to conduct an independent medical examination of Campos' right shoulder, elbow and wrist as part of the evaluation of her workers' compensation claim. (R. 250-263.) Dr. Carroll evaluated Campos on several occasions. In August and again in November, Dr. Carroll stated his opinion that Campos could work as long as she avoided

4

highly repetitive work and avoided lifting more than twenty pounds. (R. 253, 256, 263.) In January 1999, Dr. Carroll further stated that although Campos' right shoulder "was adequately treated with the subacromial decompression by her surgeon[,]" additional shoulder surgery may be necessary to decompress the acromioclavicular joint due to certain degenerative changes in that joint. (R. 250-251.)

Dr. O'Connor's notes from February 22, 1999 state that "there is a reasonable chance that her shoulder will improve if she permanently avoids overhead work and heavy lifting[,]" that it was "not prudent" to consider another operation yet, but that "[a]t this point, I do not feel that it is appropriate for [Campos] to work in any fashion." (R. 205.) Dr. O'Connor's medical notes regarding Campos end shortly thereafter; the final entry in his notes is dated March 3, 1999. (R. 205.)

In a Physical Residual Functional Capacity Assessment dated May 7, 1999, the evaluating physician[6] found Campos to have limited ability reaching in all directions, handling (gross manipulation), and fingering (fine manipulation), and further concluded that Campos "should be able to do medium work with restrictions." (R. 279, 283.)

In June 1999, Campos went to see Dr. Daniel P. Mass for an evaluation of her right shoulder and elbow. (R. 316-317.) Regarding her shoulder, Dr. Mass expressed his opinion that Campos needed "to have an arthroscopic AC joint resection and remove some of the scar tissue in the subacromial space" in order to alleviate her shoulder problem. (R. 317.) As for her elbow, Dr. Mass noted that Campos might need additional surgery, but recommended avoiding elbow surgery "for as long as possible." (R. 317.)

---

[6]The doctor's name is illegible in the record.

5

## B.    Medical History After Claimed Disability Onset Date of July 2, 1999.

On November 10, 1999, Dr. Mass performed an arthroscopic subacromial decompression[7] of Campos' right shoulder and removed scar tissue from the previous subacromial decompression. (R. 302-303.) In February 2000, Dr. Mass noted that he could authorize Campos to return to work with a five-pound lifting limitation, possibly raised to a ten-pound limitation, but Campos reported that her employer required a minimum limitation of fifteen to twenty pounds, which Campos was not ready for yet. (R. 320.) By April 11, 2000, Campos' shoulder was "doing much better" according to Dr. Mass. (R. 321.) She had "almost a full range of motion of her shoulder, . . . good internal and external rotation, and her strength [was] improving." (R. 321.)

On August 16, 2000, Campos underwent a lateral epicondylar release and ulnar nerve transposition for her right elbow, performed by Dr. Mass. (R. 305-307, 312-313.) According to Dr. Mass' notes, Dr. Mass saw Campos on August 22 and 29, and wrote a prescription for her to begin formal therapy in mid-September. (R. 311-312.)

In November of 2000, Dr. Roopa K. Karri conducted a consultative examination for the Bureau of Disability Determination Services and determined that Campos had bilateral carpal tunnel syndrome with greater decreased sensation in her right hand; ulnar nerve transposition with problems moving her right elbow and right elbow pain; a right shoulder rotator cuff tear with limitation of movement and pain; and probable cervical disc problems with spasms of the neck muscles. (R. 287). In December of 2000, Dr. Young-Ja Kim reviewed the evidence of

---

[7]Dr. Mass also referred to this procedure as an arthroscopic AC joint resection. (R. 319-321.)

6

record and completed a Physical Residual Functional Capacity Assessment. (R. 289-296.) Dr. Kim concluded that Campos could lift and carry twenty pounds occasionally and ten pounds frequently, could sit, stand and walk through a six-to-eight hour work day, should refrain from reaching overhead with her right arm due to her shoulder, should refrain from jobs requiring repetitive motion in the hand or wrist due to her carpal tunnel syndrome, should avoid jobs that required pushing/pulling hand controls in light of her shoulder and carpal tunnel syndrome, and should avoid fine manipulations due to decreased grip strength. (R. 296.)

Campos saw Dr. Mass again on January 9, 2001, February 6, 2001 and March 6, 2001. (R. 308-310.) Dr. Mass' notes indicate that although Campos was supposed to have a Functional Capacity Evaluation before the January 9, 2001 appointment, she was unable to keep the appointment for the evaluation due to an illness in the family. (R. 310.) On February 6, 2001, Dr. Mass noted that Campos still had not had the Functional Capacity Evaluation "because her lawyer told her that she had just had an injection so she shouldn't go that day, but she could have gone the next day . . . . So I have re-ordered a Functional Capacity Evaluation and I will see her back when that has been done." (R. 309.) On March 6, 2001, Dr. Mass wrote that Campos "has now had her Functional Capacity Evaluation, which is actually very good and sets her demand to a light level job defined as maximum carrying and lifting of twenty pounds on an occasional basis." (R. 308.) He concluded that Campos was at a level where she could return to work within the limits of her Functional Capacity Evaluation. (R. 308.)

## C. Campos' Testimony at the Administrative Hearing.

Campos was born on December 19, 1951, is literate in English, and has a tenth grade education. (R. 31-32.) She is married and lives with her husband and her disabled adult

7

daughter, who has Marfan's syndrome.[8]  (R. 31, 47-48.)

Regarding her work history, from 1994 until June 29, 2000, Campos worked for Holm

Industrial, in St. Charles, Illinois.  (R. 32.)  During the course of her employment at Holm

Industrial, Campos worked in various unskilled positions as an assembler, a box maker and

finally as a sealer.  (R. 31.)  Campos only worked for a few months in both 1999 and 2000

because she required light duty, which Holm Industrial did not consistently offer her.  (R. 33-34.)

Campos testified that she has looked for other work by contacting a job search agency, but the

agency told her that all of the available positions required repetitive work, which Campos needed

to avoid.  (R. 52.)

Prior to her employment at Holm Industrial, Campos worked for Statewide, an electronics

company that repairs computers.  (R. 38.)  She initially worked as an assembler where she tested

PC boards and later was trained as an electronic technician to balance the colors on computer

monitors.  (R. 38.)  In 1988, before working at Statewide, Campos cleaned offices for Firmi Lab

for approximately one year.  (R. 41.)

At the administrative hearing, Campos explained that she can write, but only for a short

period of time with her dominant (right) hand.  (R. 48.)  Campos testified that she is able to do

light housework including dusting, cooking, and laundry, but only by using her left hand.  (R. 47-

50).  She wears a brace covering her right elbow and forearm when she performs activities like

---

[8]Marfan's Syndrome is a "congenital disorder of connective tissue characterized by
abnormal length of the extremities, especially of fingers and toes, subluxation of the lens,
cardiovascular abnormalities . . . and other deformities."  Dorland's Illustrated Medical
Dictionary 1760 (29th ed. 2000).  Marfan's Syndrome affects people differently.  One of the
possible skeletal characteristics of Marfan's syndrome is scoliosis, which Campos' daughter has.
(R. 48); http://www.marfan.org/nmf/GetContentRequestHandler.do?menu_item_id=4.

driving or cleaning, (R. 45), and cannot reach higher than her shoulder with her right arm. (R. 49.) Campos is able to lift is a gallon of milk with her left arm. (R. 16, 47.) Often, Campos and her daughter share the responsibilities of cooking and laundry. (R. 48.) Further, in her application for disability insurance benefits, Campos reported that her daughter has to help her with her bra. (R. 178.)

According to Campos, the last time she saw Dr. Mass was in April 2001. (R. 43.) She has not seen a physician since that time because although she is covered under her husband's insurance, insurance does not cover treatment for a pre-existing condition. (R. 43.) Campos explained that she regularly takes Advil for the recurring pain in her neck, both shoulders, and right elbow. (R. 44.)

### D. The Vocational Expert's Testimony at the Administrative Hearing

Vocational expert Stanley Hunton ("VE") also participated in and testified at the administrative hearing. According to the VE, Campos had experience primarily in unskilled work, ranging from light to medium exertion levels. (R. 53-54.) The VE characterized Campos' work as a box cutter, package machine operator and industrial cleaning person as medium and unskilled, whereas her work as a sealer and as a molding machine operator was light and unskilled. (R. 53-54.) Her position as an electronic repair technician was a semi-skilled position requiring a medium level of exertion. (R. 54.) However, the skills she acquired in that position were job specific, and thus not transferable to another position. (R. 54.)

The ALJ then asked the VE to consider the work capacity of a hypothetical female individual who was born in 1951, had a tenth grade education, was literate in English, had acquired no transferable work skills, who can occasionally lift up to 20 pounds and frequently lift

9

up to ten pounds, who can stand and/or walk at least six hours of an eight-hour work day, and who can sit for six hours in an eight-hour work day. (R. 55.) The ALJ further asked the VE to assume that the hypothetical female individual has physical limitations that make it necessary for her to avoid ladders, scaffolding, and hazardous moving machinery, avoid reaching overhead with her right arm, avoid occupations requiring constant repetitive motion of her wrists and hands, and avoid occupations requiring fine manipulation. (R. 55.) Based upon that hypothetical, the VE stated that the following unskilled occupations would be available for the hypothetical female individual: cashier (7,000 jobs), shipping and receiving clerk (2,000), messenger (2,000), cleaning person (2,000 requiring light work), other cleaning positions (4,000 total cleaning positions), parking lot attendant (890), cafeteria attendant (1,000 requiring light work), and personal service positions such as locker room attendant (800). (R. 55-56.)

Campos' attorney then asked the VE to consider the consider a woman who fit the same hypothetical, except that she could do only occasional motion with the dominant right hand. (R. 56-58.) The VE responded that the cashier positions would no longer be an option. (R. 58.)

After the hearing, Campos' attorney supplemented the record with an argument that in the event Campos was not entitled to ongoing disability insurance benefits since July 2, 2001, then alternatively, Campos was entitled to disability insurance benefits for the period from July 2, 1999 through March 6, 2001 (the date on which Dr. Mass concluded that Campos could return to work). (R. 323.)

### E.    The ALJ's Decision

In determining whether Campos is disabled within the meaning of the Social Security Act, the ALJ had to evaluate: (1) whether Campos was currently unemployed; (2) whether she

10

has a severe impairment;[9] (3) whether her impairment satisfies the criteria for any of the impairments listed in 20 C.F.R. § 404, Subpt. P, App. 1 ("Listing"); (4) whether Campos is able to perform her past work; and (5) whether she has the ability to perform work available in the national economy. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). A conclusion that a claimant's impairment qualifies as one of the Listing impairments results in a finding that a claimant is disabled. *Id.* Likewise, even if the impairment does not qualify as a Listing impairment, if the ALJ concludes that the claimant lacks the ability to perform work available in the national economy after assessing the claimant's residual functional capacity, the claimant is deemed disabled within the meaning of the Social Security Act.

Here, after conducting this five-step inquiry, the ALJ issued a written decision dated June 27, 2002, denying Campos' application for disability insurance benefits. Specifically, the ALJ concluded that Campos had not been engaged in substantial gainful activity since her alleged onset date of disability (the first step), and that she has a medically determinable orthopedic impairment that is severe, but not an impairment that qualifies for automatic disability under the Listing criteria (steps 2 and 3). (R. 17.) Regarding Campos' past relevant work (step 4), the ALJ found that Campos had worked as an "electronic repair worker, sealing machine operator, box maker, electronic assembler, molding machine operator, package machine operator and industrial cleaner[,]" but determined that Campos was unable to perform her past relevant work because the work "either exceeds light exertional activity or is precluded by manipulative limitations[.]" (R. 17.)

---

[9]A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1520(c).

At the fifth step of the evaluation process, the burden of proof shifted to the ALJ, as designate of the Commissioner, to show that Campos was capable of performing work in the national economy. *Clifford*, 227 F.3d at 868. In assessing Campos' residual functional capacity ("RFC"), the ALJ concluded that Campos had the ability to perform light exertional level work. (R. 17.) To be more specific, the ALJ found that Campos can lift and carry objects weighing up to twenty pounds occasionally and ten pounds frequently, that she can stand, walk and sit for six hours in an eight hour workday, that she must avoid fine manipulation and tasks requiring constant repetitive motion of the wrist and hands, that she cannot perform tasks that require overhead reaching with the right shoulder, and that she must avoid climbing ropes, ladders and scaffolds. (R. 17.) Given her ability to do light work, the ALJ further found that Campos could perform unskilled jobs such as cashier (7000 jobs), shipping and receiving clerk (2000 jobs), messenger (2000 jobs), cleaning worker (4000 jobs), parking lot attendant (890 jobs), cafeteria attendant (1000 jobs) and personal service attendant (800 jobs). (R. 17.) In light of Campos' ability to perform light work, and the fact that there were a significant number of jobs in her region which she was physically capable of performing, the ALJ concluded that Campos was not entitled to disability insurance benefits either on an ongoing basis or for a closed period of disability. (R. 18.)

## III.    DISCUSSION

### I.    Standard of Review

Under the Social Security Act, 42 U.S.C. § 405(g), the ALJ's decision must be upheld as long as it is supported by substantial evidence. *Clifford*, 227 F.3d at 869. Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept

12

as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 398, 401 (1971) (internal quotation marks omitted). The reviewing court "may not decide the facts anew, re-weigh the evidence or substitute its own judgment for that of the [ALJ] to decide whether a claimant is or is not disabled." *Powers v. Apfel*, 207 F.3d 431, 434-35 (7th Cir. 2000). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on [the ALJ, as designate of the Commissioner]." *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987).

The standard of review is deferential, but "it is not entirely uncritical." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). To survive appellate review, the ALJ's written opinion must "build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ need not provide "a written evaluation of every piece of evidence or testimony." *Herron*, 19 F.3d at 333. But if the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F. 3d. at 940.

## B.     Issues for Review

On appeal, Campos argues that (1) the ALJ's decision was not supported by substantial evidence because he failed to consider the time period at issue in his decision, (2) that the ALJ failed to make any credibility determination whatsoever, and (3) that the vocational expert failed to cite jobs within Campos' capacity. The court addresses these arguments in turn.

### 1.     The ALJ's Consideration of the Relevant Time Period

In order to be entitled to disability benefits, Campos had to prove that she was disabled and unable to engage in substantial gainful activity for at least twelve consecutive months. 42

13

U.S.C. § 1382c(a)(3)(A); *Barnhart v. Walton*, 535 U.S. 212, 218-221 (2002). According to

Campos, the ALJ's finding that she was not entitled to disability insurance benefits for a closed

period of disability from July 2, 1999 through March 6, 2001 is not supported by substantial

evidence because the ALJ failed to consider the entire period before March 6, 2001.[10] Campos

acknowledges that the ALJ need not discuss every piece of evidence, but argues that the ALJ

improperly ignored "an entire line of evidence that is contrary to his ruling." (Pl.'s Mem. Summ.

Reversal at 11, citing *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).) The Commissioner

counters that the ALJ considered the entire period at issue, and reasonably determined that

Campos was not entitled to benefits for a period of disability. For the reasons explained below,

the court agrees with the Commissioner.

As an initial matter, it is clear from the record that the ALJ reviewed the evidence from

the time period between July 2, 1999 and March 6, 2001. The ALJ's written opinion specifically

references Dr. Mass' records relating to her shoulder surgery in November 1999 and elbow

surgery in August 2000, the internal medical examination by Dr. Karri in November 2000, the

RFC assessment by Dr. Kim in December 2000 finding Campos capable of performing light

work, and Dr. Mass' conclusion on March 6, 2001 that Campos could return to light work. (R.

14-15.) Indeed, Campos concedes that the ALJ's opinion references evidence from the relevant

time period. But in Campos' view, the ALJ "ignore[d] the fact of the surgeries (coupled with

numerous prior surgeries) and the recovery period" and failed to discuss the significance of the

---

[10]In her brief, Campos actually claims the ALJ failed to consider the evidence through
March 21, 2001, rather than March 6, 2001. (Pl.'s Mot. Summ. Reversal at 10.) The court
assumes the March 21, 2001 date is a typographical error because the record is clear that Dr.
Mass released Campos to work no later than March 6, 2001. (R. 308.)

14

evidence from the period at issue. (Pl.'s Mem. Summ. Reversal at 11.) According to Campos, if the ALJ had properly considered the evidence from the time period between July 2, 1999 through March 6, 2001, the necessary conclusion is that Campos was disabled for the entire period. (Pl.'s Reply at 2-3.)

Despite Campos' opinion to the contrary, the evidence from the closed time period does not conflict with the ALJ's ruling. Campos notes that during the closed time period, Dr. Mass had to perform two additional surgeries. In November 1999, he operated on her right shoulder, and in August 2000, he operated on her right elbow. (R. 302-303, 305-307.) Campos contends that the fact that her treating physician recommended additional surgery in June 1999, which was not performed until November of that year, and that she required additional surgery in August 2000 shows that she was disabled for at least thirteen months after the July 1999 onset date of disability, without even considering the necessary time for recovery from the August surgery. The record supports a reasonable conclusion to the contrary, however.

For one thing, the record does not mandate the conclusion that Campos was disabled since July 2, 1999. The RFC assessment from May 7, 1999 concludes that Campos was capable of medium work with limitations at that time. (R. 283.) And although Dr. Mass recommended additional shoulder surgery in June 1999, (R. 316-317), his evaluation does not suggest that Campos was unable to work until the surgery, nor are there any records indicating that Campos was instructed not to work between June 1999 and November 1999 when Dr. Mass performed the shoulder surgery.

Nor does the record require a conclusion that Campos was disabled between her November 1999 shoulder surgery and August 2000 elbow surgery. On February 15, 2000, Dr.

15

Mass noted that he could authorize Campos to return to work with a five-pound lifting limitation, possibly raised to a ten-pound limitation, but Campos reported that her employer required a minimum limitation of fifteen to twenty pounds, which Campos was not ready for yet. (R. 320.) By April 11, 2000, Campos' shoulder was "doing much better" according to Dr. Mass. (R. 321.) She had "almost a full range of motion of her shoulder, . . . good internal and external rotation, and her strength [was] improving." (R. 321.) Additionally, on June 27, 2000, when Dr. Mass recommended additional surgery for Campos on her right elbow, he did not bar Campos from working until the surgery. Rather, he wrote in his notes that until the surgery, "I am going to decrease her repetitive work activities." (R. 313.)

Moreover, although Campos points out that Dr. Mass "stressed that due to the extensive nature of the [November 1999 and August 2000] surgeries a long period of rehabilitation would be necessary," (Pl.'s Mem. Summ. Reversal at 11, citing R. 313), Campos' summary mischaracterizes Dr. Mass' opinion regarding the necessary rehabilitation. Dr. Mass noted that Campos would require a long rehabilitation period *after* her elbow surgery on August 16, 2000; his rehabilitation opinion had nothing to do with her shoulder surgery the previous November. (R. 313.) Further, the "long" rehabilitation period lasted less than twelve months. It is undisputed that Campos was authorized to return to work no later than March 6, 2001—less than seven months after the August 2000 surgery.

In light of the evidence discussed above, there is ample record evidence to support the ALJ's conclusion that Campos failed to prove that she was disabled for a continuous twelve-month period, and thus was not entitled to disability insurance benefits. The court finds that the ALJ considered the evidence from the time period between July 2, 1999 and March 6, 2001.

16

Furthermore, the ALJ did not ignore an entire line of evidence that was contrary to his

conclusion, *see Zurawski*, 245 F.3d at 888, and while he did not discuss all of the evidence in

detail, he had no obligation to do so, *Herron*, 19 F. at 333; *Dixon v. Massanari*, 270 F.3d 1171,

1176 (7th Cir. 2001). Because the ALJ's opinion is supported by substantial evidence in the

record, the ALJ's decision must be upheld. *Clifford*, 227 F.3d at 869.

## 2. The ALJ's Credibility Determination

Campos next contends that the ALJ failed to make a credibility determination because

none of the ALJ's eight findings addressed credibility. The court disagrees.

Under the regulations, the ALJ had to evaluate the effect of Campos' symptoms and pain

on her ability to work. 20 C.F.R. § 404.1529. As part of his evaluation, the ALJ had to consider

the evidence, including any inconsistencies in the evidence and whether Campos' statements

regarding the intensity, persistence and limiting effects of her symptoms conflicted with other

evidence. 20 C.F.R. § 404.1529(c)(4). In other words, the ALJ had to make a credibility

determination regarding Campos' testimony. Despite Campos' contention to the contrary, the

ALJ made an explicit credibility finding based on Campos' testimony and the medical and

objective evidence before him during the hearing. The ALJ explicitly stated that he "did not fully

credit the claimant's testimony as to limitations being at a disabling level of severity as the

claimant last had medical treatment in April of 2001 and takes periodic over-the-counter

medication. This is not consistent with disabling limitations." (R. 16.) Moreover, the fact that

the ALJ did not include an explicit credibility determination in one of the eight "Findings" is of

no consequence. The court is unaware of any caselaw or regulation that requires an ALJ to

include a credibility finding in the "Findings" portion of the written decision. The court thus

17

rejects Campos' argument for reversal based on the lack of a credibility finding because the ALJ

sufficiently articulated his credibility determination and that determination is not "patently

wrong," *Powers*, 207 F.3d at 435 (ALJ's credibility findings will not be disturbed unless patently

wrong).[11]

### 3.    The Vocational Expert's Evaluation

Campos' final argument for reversal or remand is that the jobs cited by the vocational

expert require abilities that exceed her work capacity. At the administrative hearing, the ALJ

presented the VE with a hypothetical based upon Campos' physical abilities and limitations.

(R.55.) In response to the ALJ's hypothetical, the VE testified that the following unskilled

occupations would be available for a female individual with the abilities and limitations set forth

in the hypothetical: cashier, shipping and receiving clerk, messenger, cleaning person, parking lot

attendant, cafeteria attendant, and personal service positions such as locker room attendant. (R.

55-56.) According to Campos, each of the positions cited by the VE requires handling or

manipulation, but she cannot perform either of those functions. As a result, she argues that the

jobs cited by the VE do not provide substantial evidence that there are a significant number of

jobs available which Campos is able to perform.

Campos is correct that each of the positions cited by the VE requires handling or

manipulation according to the *Dictionary of Occupational Titles* ("DOT") (4th ed. 1991). The

---

[11]In the opening brief, Campos argued that the ALJ "failed to make any credibility finding
whatsoever." (Pl.'s Mem. Summ. Reversal at 11.) In her reply brief, Campos argues for the first
time that the ALJ did not make a credibility determination regarding the closed period at issue.
(Pl.'s Reply at 3.) Because Campos failed to raise this argument in her opening brief, however,
the argument is waived. *Walker v. Wallace Auto Sales, Inc.*, 155 F.3d 927, 930 n.4 (7th Cir.
1998); *Marie O. v. Edgar*, 131 F.3d 610, 614 n.7 (7th Cir. 1997).

18

DOT assigns a specific nine-digit occupational code to a specific job. For example, the

occupational code for a shipping and receiving clerk is 222.387-050, codes for cafeteria attendant

include 311.677-010, the code for one type of cleaning position is 301.474-010, the code for a

messenger is 239.677-010,[12] the code for locker room attendant is 358.677-014, and the code for

a personal attendant is 309.674-014.[13,14] The sixth digit of the code indicates the types of tasks

the job requires. *DOT*, introduction at xix. A "4" indicates that the job requires manipulation

whereas a "7" indicates that handling is required. A review of the occupational codes cited

above shows that each of those six positions requires handling or manipulation.

As defined in the DOT, "handling" requires "[u]sing body members, handtools, and/or

special devices to work, move, or carry objects or materials." *DOT* at 1007. *Selected*

*Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* (1993)

("Selected Characteristics of Occupations") further defines "handling" as "[s]eizing, holding,

grasping, turning, or otherwise working with hand or hands. Fingers are involved only to the

extent that they are an extension of the hand, such as to turn a switch or shift automobile gears."

*Selected Characteristics of Occupations*, Appendix C at C-3. The *DOT* defines "manipulation"

as "[u]sing body members, tools, or special devices to work, move, guide, or place objects or

materials." *DOT* at 1007. *Selected Characteristics of Occupations* does not define

"manipulation," but it defines "fingering" as "[p]icking, pinching, or otherwise working

---

[12]239.567-010, the code cited by Campos for messenger, is the code for an office helper.

[13]309.677-014, cited by Campos for personal attendant, is actually the code for foster parent.

[14]Campos did not suggest DOT job codes for the cashier and parking lot attendant positions cited by the VE.

19

primarily with fingers rather than with the whole hand or arm as in handling." *Selected Characteristics of Occupational Titles*, Appendix C at C-3. According to the Physical Residual Functional Capacity Assessment forms, handling involves gross manipulation whereas fingering involves fine manipulation. (*E.g.*, R. 279.)

Although Campos contends that she is unable to perform jobs requiring handling or manipulation, she cites no evidence in the record to support her claim, and in fact, the record contradicts her contention. When Dr. Kim assessed Campos' RFC in December 2000, he concluded that she has the ability to perform unlimited handling (gross manipulation) and has limited ability for fingering (fine manipulation). (R. 292.) Moreover, the ALJ's hypothetical to the VE was consistent with those RFC limitations. The ALJ specifically instructed the VE that the individual needed avoid occupations requiring constant repetitive motion of her wrists and hands, and to avoid occupations requiring fine manipulation. (R. 55.)

Additionally, while it is possible that a some of the positions cited by the VE require performance of tasks that exceed Campos' abilities, substantial evidence supports the ALJ's conclusion that there a significant number of jobs available that match Campos' RFC. The ALJ found that Campos is capable of performing light work, but that she must avoid fine manipulation and tasks requiring constant repetitive motion of the wrists and hands. (R. 17.) According to Campos, the cashier positions should be excluded from consideration because they require too much repetition. Although the ALJ disagreed (R. 17), for present purposes, the court assumes (without deciding) that Campos is correct, and excludes those 7000 positions from its analysis. Likewise, the shipping and receiving clerk position coded as 222.387-050 requires

medium-level exertion, so it is excluded.[15] The court also excludes the cleaning positions from consideration, in case such positions actually require medium rather than light level exertion.[16,17] Setting aside those occupations, the messenger (239.677-010) and cafeteria attendant (311.677-010) occupations cited by the VE are sufficient to support the ALJ's conclusion that there are a significant number of jobs available which Campos has the ability to perform, (R. 17.)[18] The *DOT* descriptions of the messenger and cafeteria attendant positions are consistent with the VE's testimony and Campos' RFC.[19] Based on the VE's testimony, the ALJ concluded that there are

---

[15]There may other shipping and receiving clerk positions that require light-level exertion, but the only code presented to the court was 222.387-050.

[16]The VE testified that there are 2000 light level cleaning positions. (R. 55.) According to the *DOT*, the occupational code cited by Campos for cleaning positions (301.474-010) requires medium-level exertion, thus exceeding Campos' ability, whereas the code cited by the Commissioner (323.687-014) is designated in the *DOT* as light-level. In an abundance of caution, the court is giving Campos the benefit of the doubt by excluding cleaning positions from its analysis.

[17]The court did not consider the parking lot attendant position (890 jobs) because the court was unable to identify an appropriate occupational code. The court also excluded the personal attendant position (309.674-014) because *Selected Characteristics of Occupations* indicates that those positions require frequent fingering (fine manipulation, 1/3 to 2/3 of the time). *Selected Characteristics of Occupations* at 368 and Appendix C, C-3. Finally, the court did not consider the locker room attendant position (358.677-014) because the VE's testimony did not specifically address how many of those positions are available.

[18]In her brief, the Commissioner focused on cleaning positions and cafeteria attendant positions as examples of positions that have *DOT* descriptions that are consistent with the VE's testimony. Although the Commissioner did not specifically discuss the messenger position, based on the occupational code cited by Campos and the court's review of the *DOT* and *Selected Characteristics of Occupations*, it is clear that the messenger position fits Campos' RFC.

[19]According to *Selected Characteristics of Occupations*, fingering (fine manipulation) is not required for the messenger position, and the cafeteria attendant position requires only occasional fingering (*i.e.* up to 1/3 of the time). *Selected Characteristics of Occupations* at 347 (messenger) and 367 (cafeteria attendant).

2000 messenger jobs and 1000 cafeteria attendant jobs available in the region where Campos lives. The availability of 3000 jobs is more than sufficient for the court to affirm the ALJ's decision. *Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993) (affirming summary judgment in favor of Commissioner, finding that 1400 potential jobs constituted a significant number of jobs).

## IV.    CONCLUSION

As explained above, the court finds that the ALJ's decision denying Campos' application for disability insurance benefits is supported by substantial evidence. Regarding the closed period between July 2, 1999 and March 6, 2001, the court finds that the ALJ considered evidence from that time period and did not ignore an entire line of evidence that was contrary to his conclusion. Additionally, despite Campos' argument to the contrary, the ALJ made a credibility determination regarding her testimony. Finally, substantial evidence supports the ALJ's conclusion that there are a significant number of jobs available which Campos is able to perform. Accordingly, the court grants the Commissioner's motion for summary judgment and denies Campos' motion for summary judgment.

ENTERED:

*Nan R. Nolan*

NAN R. NOLAN

United States Magistrate Judge

Dated: April 18, 2005

22